UNITED STATES of America,
Plaintiff–Appellee,

v.

Rene C. MARTINEZ, Kenneth W. Noel, and Steven T. Garcia, Defendants–Appellants.

Nos. 92–1231, 92–1289, and 92–1338.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 15, 1992.

Decided March 4, 1993.

---

Timothy O'Shea, Madison, WI (argued), for U.S.

Frank M. Tuerkheimer, Lafollette & Sinykin, Madison, WI (argued), for Rene C. Martinez.

Stephen J. Meyer, Vanmetre, Hanson & Meyer, Madison, WI (argued), for Kenneth W. Noel.

Manuel R. Galang, Wauwatosa, WI (argued), for Steven T. Garcia.

Before CUDAHY and COFFEY, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

Rene C. Martinez, Kenneth W. Noel and Steven T. Garcia, inmates at Oxford prison, a federal correctional institution within the territorial jurisdiction of the United States, were tried before a jury for the death of an inmate and the assault of another. On November 18, 1991, the defendants were found guilty of second-degree murder, 18 U.S.C. § 1111, and assaulting and causing serious injury, 18 U.S.C. § 113(f). Noel additionally was found guilty of possession of weapons by an inmate, 18 U.S.C. §§ 1791(a)(2) & 1791(d)(1)(B).[1] Martinez was sentenced to concurrent terms of 200–months and five years, a five year term of supervised release, and a criminal assessment penalty of $100.00. Noel was sentenced to concurrent terms of 405 months and five years, five years supervised release, and a $200.00 criminal assessment penalty. Garcia was sentenced to concurrent terms of 212 months and five years, five years supervised release, and a $100.00 criminal assessment penalty. In each case the term of imprisonment is consecutive to the term presently being served. On appeal, the defendants raise a number of issues regarding the propriety of their convictions. We affirm.

---

1. Noel conceded guilt as to these counts. Transcript at 1–A–25; 4–B–45.

I.

On April 27, 1991, at approximately 7:45 PM, a fist fight broke out between Martinez and Charles Sammons in the B wing of the Portage House Unit at Oxford prison. Within seconds, inmates from the A and B wing gathered to watch and cheer on the fight. Officer Darren L. Glattfelder was the first guard to arrive on the scene. He stepped between the two men in an effort to stop the fighting. Transcript at 1–B–11. Glattfelder was shorter and lighter than either contestant, and the blows continued. Unable to break it up on his own, Glattfelder depressed his body alarm [2] to notify other correctional officers that a problem had arisen. Glattfelder pushed through the crowd of inmates, making his way to the entrance door of the B wing to meet responding officers. Glattfelder testified at trial that he did not observe any weapons involved at this point in the fight. Tr. at 1–B–10–14.

At the time the fight initially broke out, inmates Garcia and Noel were in the B wing television room. Garcia and Noel joined in the encounter shortly after Glattfelder sounded the alarm. There was testimony that, at this point, Martinez was receiving the brunt of the fight. Garcia, Martinez' roommate, interceded on his behalf. Noel testified that he joined in after observing Brown enter the corridor from his cell and grab Martinez from behind. Whether Brown was an active participant in the fight, or merely an innocent bystander, was contested at trial.

Officers Schirmer, Shy, and Williams and Rec. Specialist Merrill responded to Glattfelder's alarm. As Schirmer and Shy pushed their way through the crowd of the now approximately fifty inmates that had gathered, Glattfelder, Williams and Merrill directed the crowd of inmates to their cells. Upon their arrival, Schirmer and Shy observed Martinez and Garcia continually punch and kick Sammons and Brown as the two lay on the hallway floor. Sammons and Brown offered no resistance then or during the remainder of the encounter. At the same time, Noel held back the officers by holding up a "shank." The shank was described as an ice pick-type knife consisting of a blade approximately six to eight inches long attached to a black handle. Tr. at 1–B–112. The officers observed that Noel was highly agitated and was yelling for the officers to stay back. Tr. at 1–B–113. Despite the officers' demands to drop the shank, Noel proceeded to stab the victims a number of times, then turned around and yelled, "Stay back. When we're through with him, you can have him." Tr. 2–B–41, 137. At the same time, Martinez and Garcia switched back and forth between the two victims as they continued to kick and beat them. There was testimony that at one point Martinez' shoe was caught in Brown's mouth. The officers continued to order the defendants to stop and Schirmer approached the inmates with a mop wringer—however, the attack on Sammons and Brown continued. Eventually, Martinez, Noel, and Garcia voluntarily ceased the attack and returned to their cells in the immediate area.

Both the ownership and use of the shank during the encounter remain unclear. The evidence clearly demonstrated that Noel struck both Sammons and Brown with the shank. While there was no direct testimony demonstrating that either Martinez or Garcia used the shank, witnesses testified that they observed Garcia making a thrusting motion with his fist as he knelt over Sammons. Additionally, inmate Margiotta testified that while Noel stabbed Sammons, Martinez held him down and continually struck him in the face. Tr. at 2–A–55, 56. Inmate Cummings also testified that both Martinez and Garcia were "rolling" Sammons while Noel stabbed him. Tr. at 2–A–157–58. This testimony was buttressed by Williams, who testified that he observed either Garcia or Martinez "uncurl" or "open" Sammons as Noel stabbed him.

2. Correctional officers working directly with inmates are unarmed. These officers carry a body alarm which, when activated, emits a loud beeping sound and signals the dispatcher that an officer needs assistance. The apparatus also acts as a communication device. When activated, the officers can speak directly with the prison control center. Tr. at 1–B–6–7.

None of the evidence adduced at trial demonstrated that Martinez or Garcia brought the shank to the fight. Whether Noel initially introduced the shank, or whether Brown brought it and Noel retrieved it from him, was contested at trial. The testimony did tend to show that Martinez and Garcia took the shank with them when they went back to their cells and flushed it into the sewer line, along with pieces of torn sweat clothing. On April 28, a day after the incident, these items were extracted from the sewer in approximately the same location as Martinez' and Garcia's cell. Tr. at 1–B–73. The clothing was similar to that which Martinez wore at the time of the encounter, but was not wearing later that evening.

Both Sammons and Brown were taken for medical treatment. Sammons died shortly thereafter. Dr. Robert Huntington, the pathologist, established that the cause of death was from one of two stab wounds out of the approximately 27 wounds found on Sammons' body (a number of which entered from the back). One of the apparently fatal wounds entered the left side of Sammons' head, continued across through the brain and down into the bone over the right eye. The other wound entered the back and severed the pulmonary vein. Brown suffered from serious injuries, including approximately five stab wounds, a broken jaw, and a loss of five teeth. As a result of the beating, Brown has impaired perception, cannot chew properly and has lost the feeling in the lower part of his mouth. Tr. 2–B–110, 111. The defendants stipulated that Brown's injuries were serious.

At trial, detailed testimony concerning these events was given by numerous witnesses. The estimates of elapsed time during the fight vary; the longest estimate approximately ten minutes. The episode can be summarized as follows: initially, there was a fistfight between Sammons and Martinez. Garcia came to the aid of Martinez, and then Brown seems to have joined to help Sammons, although he was unable to remember at trial how he became involved. Noel next joined the encounter to help Martinez and Garcia and, shortly thereafter, Sammons and Brown were down and offering little or no resistance. During most of the time that the officers were on the scene, Martinez and Garcia were kicking and punching Sammons and Brown, alternating between them. Noel stabbed Sammons more than 27 times, and Brown received five stab wounds.

On June 19, 1991, an indictment was returned against the three defendants. Count I charged all three defendants with first degree murder of Sammons; Count II with assault of Brown, resulting in serious bodily injury; and Counts III and IV each charged Noel with possession by an inmate of an object designed and intended to be used as a weapon. The "object" in Count III apparently was the shank used to stab Sammons and Brown. Although some of the claims of error, particularly by Noel, relate to Count II, all defendants assign error with respect to Count I.

Under Count I, Judge Shabaz submitted forms of verdict on first degree murder, as charged, and also on second degree murder and voluntary manslaughter as lesser included offenses. One element peculiar to first degree murder in the circumstances of this case is premeditation. The jury acquitted defendants of first degree murder, apparently finding no premeditation. A second element, common to first and second degree murder, is "malice aforethought", principally dealt with in the parties' arguments in terms of "intent." 18 U.S.C. § 1111. Manslaughter is the unlawful killing of a human being without malice, and it is punished as voluntary manslaughter if "upon a sudden quarrel or heat of passion." 18 U.S.C. § 1112(a). The defendants argued at trial, echoed here, that they had no premeditated design to kill, and that the events proceeded at so fast a pace that they had no opportunity to, and did not, form the intent equivalent to malice aforethought. The government argued that there was ample time. The jury found all three defendants guilty of second degree murder, thus finding malice aforethought.

The district judge additionally instructed on the elements of self-defense, including

defense of another. On appeal, none of the defendants seriously contends that they acted in self-defense, and only Noel makes a claim of defense of another. Rather, each contends that alleged errors prejudiced him in his chance to have the jury find that he killed without malice and upon a sudden quarrel or heat of passion. Had the jury so found as to any of them, it would have acquitted the defendant of second degree murder and found him guilty of voluntary manslaughter.

The defendants raise a number of issues regarding the propriety of their convictions.

## II.

### A. Refusal to Instruct that Killing Upon a Sudden Quarrel is an Element of Voluntary Manslaughter Distinct from Killing in Heat of Passion

■ Voluntary manslaughter is defined by a statute that has remained unaltered since its enactment in 1948. It is the unlawful killing of another, without malice, "upon a sudden quarrel or heat of passion." 18 U.S.C. § 1112(a). In the context of this trial, the most significant issue was whether the killing was voluntary manslaughter and the government had the burden of proof on that issue. At the close of trial, the district judge instructed the jury on voluntary manslaughter:

> Evidence has been presented that the defendant acted in the heat of passion. Where such evidence has been presented, the burden is on the government to prove beyond a reasonable doubt that a Defendant did not act in the heat of passion, if

the government is to prevail on the murder charge.

\* \* \* \* \* \*

Heat of passion may be provoked by fear, rage, anger or terror. Provocation, in order to be adequate, must be such as might naturally cause a reasonable person in the passion of the moment to lose self-control and act on impulse and without reflection.

Tr. at 4–B–128, 130. The defendants objected to the proposed instruction on manslaughter, arguing that the instruction should treat a killing which occurs "upon a sudden quarrel" as a matter distinct from heat of passion, so as to be proved beyond a reasonable doubt as an element of manslaughter, or more importantly in this case, disproved beyond a reasonable doubt before there can be a conviction of murder. The court declined to include the requested language, concluding that "sudden quarrel would very well fall within the Court's definition of heat of passion." Tr. 235, at 17. Garcia asserts on appeal that the court erroneously failed to instruct the jury that they could return a verdict for voluntary manslaughter upon finding that he acted "upon a sudden quarrel".[3]

The government contends that we cannot reverse unless we find that the district court committed "plain error", largely due to Garcia's failure to inform the court that the "sudden quarrel" component of voluntary manslaughter was his theory of defense to murder. The government, however, concedes that Garcia's objection was "comprehensive" (Gov. Brief, at 44), and we must agree.[4] Garcia submitted pro-

---

**3.** Garcia also argues that the court failed to instruct the jury that the Government must prove beyond a reasonable doubt the absence of a sudden quarrel. *See United States v. Lesina,* 833 F.2d 156 (9th Cir.1987) ("the government bears the burden of proving beyond a reasonable doubt the absence of heat of passion or sudden quarrel where that defense is raised"); *United States v. Lofton,* 776 F.2d 918 (10th Cir. 1985) (government carried burden to prove beyond a reasonable doubt that defendant killed with malice aforethought and that he or she did so in absence of heat of passion); *see also Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) (jury instruction that malice could be conclusively implied from intentional

and unlawful act unless defendant proved by preponderance heat of passion on sudden provocation required reversal). Because we hold that the instruction on sudden quarrel was not required, we need not address this argument concerning burden of proof.

**4.** In particular, Garcia initially submitted a proposed instruction providing that the Government must prove beyond a reasonable doubt that "the defendant acted upon a sudden quarrel; or that the defendant acted in the heat of passion and that the heat of passion was caused by adequate provocation[.]" Tr. 135, at 11. The district court refused, and Garcia submitted a

posed instructions and subsequently objected to the district court's refusal—both in writing and orally. Garcia clearly stated in a motion for reconsideration that the proposed instruction was "critical to his defense," and he renewed this objection at the hearing. Garcia has preserved his objection for purposes of this appeal.

Voluntary manslaughter is the unlawful killing "upon a sudden quarrel or heat of passion." Garcia would treat "a sudden quarrel" as distinct from and an alternative to "heat of passion." Because the encounter, at least initially, could have been described as "a sudden quarrel", he argues that he was prejudiced by the omission of that term from the instructions. Read literally, the statutory language—written in the disjunctive—supports defendant's claim that a killing upon a sudden quarrel is an alternative to the heat of passion defense. The inception and development of the voluntary manslaughter statute, however, raises a question in this regard.[5]

The evolution of common law manslaughter began in the early sixteenth century. During this time, killings "upon some sudden affray" were prevalent and were acknowledged to be a major danger to the preservation of the communal order. Brown, B., The Demise of Chance Medley and the Recognition of Provocation as a Defense to Murder in English Law, 7 Am. J.L.Hist. 310, 310–11 (1963) (hereinafter "Demise of Chance Medley"). The "sudden affray" or "sudden brawl", was referred to at that time as a "chance medley."[6] Demise of Chance Medley, at 311.

The chance medley was a deadly confrontation between men accustomed to wearing weapons that generally ensued from a drunken brawl or in defense of a breach of honor. Comment, Provoked Reason in Men and Women: Heat–of–Passion Manslaughter and Imperfect Self–Defense, 33 U.C.L.A.L.Rev. 1679, 1684 n. 30 (1986). In 1949, Lord Goddard, *C.J.*, referring to "old Crown law authorities," described the crime as follows:

> Where ... the killing was the outcome of a quarrel or fight, it was excusable, though not justifiable, if the killer had not begun but had taken part in the fight, or if having begun it, he endeavored to decline any further struggle and retreated, but being closely pressed, killed his antagonist to avoid himself being killed or maimed.

*Tr. v. Semin*, 1 K.B. 405, 407–08 (1949), *quoted in* Demise of Chance Medley, at 311 & n. 8.

The very nature of these killings denied the accused the shelter of self-defense. However, due to the custom of wearing side-arms, combined with the heat of anger generated by the affray, the courts viewed this type of killing as a less morally reprehensible form of homicide than that which was long premeditated and carried out in cold blood. *Id.* at 311. Up until the eighteenth century, however, a person who killed another was punished on an "equal footing"—that is, only by death. In the absence of clear evidence of malice, the courts were unwilling to impose this sentence, believing as a matter of policy that

---

Motion for Reconsideration and Objection to the instructions proposed by the court, which did not include the "sudden quarrel" language. Garcia argued:

> The instructions on Malice Aforethought, First and Second Degree Murder, and Manslaughter each recognize that a killing 'upon a sudden quarrel' negates the existence of malice required for a conviction of first or second degree murder. The defendant asserts that under the factual circumstances of this case, the Court's refusal to so instruct the jury improperly denies the defendant of an instruction which correctly states the law, *and which is critical to his defense.*

Tr. 176, at 1 (emphasis added). Garcia also filed a proposed definition of "upon a sudden quarrel." R. 175, Requested Inst. No. 10. At the final pretrial hearing, Garcia renewed his request that "sudden quarrel be treated in the same way that heat of passion is." Tr. 235, at 11.

5. For a general discussion on the early history of manslaughter, *see* Kaye, The Early History of Murder and Manslaughter, 83 L.Q.Rev. 569 (1967).

6. This type of confrontation was originally referred to as a "chaud meleé" or "chaunce medley," and later evolved into the more familiar term "chance medley". Demise of Chance Medley, at 311.

such a sanction was excessive. Courts taking this view punished those who killed as a result of a chance medley less severely—such as by forfeiture of property and hand-burning. *Id.* at 311, 312; Dressler, Rethinking Heat of Passion: A Defense in Search of a Rationale, 73 J. of Crim.Law & Criminology 421, 426 (1982) (hereinafter "Rethinking Heat of Passion").

From its common law inception, therefore, the courts recognized death by "sudden quarrel"—where neither side sought or took an undue advantage—as an independent ground for reducing murder to manslaughter. Ashworth, The Doctrine of Provocation, 35 Cambridge L.J. 292, 293 & n. 6 (1976). However, a second branch of manslaughter began to evolve from the "sudden quarrel" concept where an accused had been sufficiently provoked that he killed in passion. Demise of Chance Medley, at 313. During the eighteenth century the use of chance medley or "sudden quarrel" as a defense fell into disuse as the result of two influences:

(1) the gradual stages by which the custom of wearing sidearms became disestablished (a process virtually completed by the latter part of the eighteenth century); and (2) the increase, attributable in part to (1), in popularity of the defense of provocation.

*Id.* at 313. In 1828, the concept of chance medley was eventually abolished. 9 Geo. 4, c. 31 (1828); *see* Rethinking Heat of Passion, at 426 & n. 56; Demise of Chance Medley, at 313 & n. 15. However, the doctrine of provocation and killing while in the heat of passion persisted, and over the century expanded into the heat of passion doctrine used today. Rethinking Heat of Passion, at 426–27; *see also* Kaye, The Early History of Murder and Manslaughter, Part II, 83 L.Q.Rev. 569, 600–01 (1967).

Since that time, few courts have had an opportunity to revisit the viability of chance medley. In the English courts, the fate of chance medley was addressed by the Court of Criminal Appeal in *Tr. v. Semini*, 1 K.B. 405 (1949). In *Semini*, counsel argued that because chance medley was a separate offense, the law of provoca-

tion had no application. The court "made it clear that chance medley had been a dead letter since the abolition of forfeiture for non-felonious killings, and that its attempted perpetuation was based on a misconception of its pre-nineteenth century function." Demise of Chance Medley, at 316.

The above discussion may suggest the following: (1) the "sudden quarrel" or "chance medley" doctrine developed in response to the circumstances of the times; (2) those circumstances—such as the custom of wearing sidearms and the harsh death sentence imposed on anyone who killed—are no longer prevalent; (3) as circumstances changed, the doctrine fell out of disuse; and (4) heat of passion appears to be a more refined and expanded "chance medley" doctrine, and not a separate and distinct theory in itself. The history of "sudden quarrel" in today's legal system is sparse, at best. An extensive discussion of the adoption of Section 1112(a) is set out in *United States v. Alexander*, 471 F.2d 923, 944–45 n. 54 (D.C.Cir.), *cert. denied*, 409 U.S. 1044, 93 S.Ct. 541, 34 L.Ed.2d 494 (1972); we extrapolate a portion here.

Section 1112(a) is the direct descendant of Section 274 of an act to revise, codify and amend the penal laws of the United States, March 4, 1909, ch. 321, 35 Stat. 1143. The federal law before revision appeared in Revised Statutes § 5341 (1878 ed.), which read:

Every person who, within any of the places or upon any of the waters unlawfully and willfully, but without malice, strikes, stabs, wounds, or shoots at, or otherwise injures another, of which striking, stabbing, wounding, shooting, or other injury such other person dies, either on land or sea, within or without the United States, is guilty of the crime of manslaughter.

A special commission, appointed in 1897 to revise and codify the federal criminal and penal laws, issued a Final Report in 1906 which provided the following definition of manslaughter:

Sec. 8931. Whoever, unlawfully and willfully, but without malice, shall kill another, is guilty of manslaughter, and shall

be fined not more than one thousand dollars and imprisoned not more than ten years.

In its comments, the Commission elaborated:

> Speaking in general terms, it may be stated that the statutes of nearly, if not quite, all of the States of the Union make homicide with malice and premeditation murder in the first degree; homicide with malice, but without premeditation, murder in the second degree, and homicide without malice or premeditation manslaughter. These lines of demarcation have been observed in the sections which we here submit....
>
> The definition of manslaughter in section 5341, Revised Statutes, is amplified so as to include a number of specific acts resulting in death, which do not come within the language of that section.

1 Final Report of the Commission to Revise and Codify the Laws of the United States 113 (1906). Two years later, the Commission issued another report. The manslaughter section, now labeled as Section 8902, contained the identical language as exists today. Act of March 4, 1909, ch. 321, § 274, 35 Stat. 1143. However, no explanation was given for the change in wording. In 1908, a special joint committee issued a report, which provides some assistance to explain the Committee's intentions. The committee commented:

> Under existing law there is no statutory definition of the crimes of murder or manslaughter. The Commission reported sections defining such crimes, and the committee has changed them in some respects. [*Id.* at 12]
>
> \* \* \* \* \* \*
>
> Section 270 [Murder]: This section enlarges the common-law definition, and is similar in terms to the statutes defining murder in a large majority of the states. [*Id.* at 24]
>
> Section 271 [Manslaughter]: What is said with respect to section 270 is true as to this section, manslaughter being defined and classified in language similar to that found in the statutes of a large majority of the states. [*Id.* at 24]

A report by the Special Joint Committee on the Revision of the Laws, Revision and Codification of the Laws, Etc., H.Rep. No. 2, 60th Cong., 1st Sess. 1–5 (1908); S.Rep. No. 10, 60th Cong., 1st Sess. 1–5 (1908). Section 1112(a), enacted in 1948, differs from the 1909 Act only in its provisions relating to involuntary manslaughter.[7]

---

**7.** Although the voluntary manslaughter statute remains unaltered today, it has not been free from attack. In the late 1960's, Congress enacted Public Law 89–801, which established a National Commission on Reform of the Federal Criminal Laws. This Commission conducted an extensive review of the federal criminal laws. In 1970, the Commission recommended the following language for manslaughter:

> A person is guilty of manslaughter, a Class B felony, if he:
> (a) recklessly causes the death of another human being; or (b) causes the death of another human being under circumstances which would be murder, except that he causes the death under the influence of extreme emotional disturbance for which there is reasonable excuse. The reasonableness of the excuse shall be determined from the viewpoint of a person in his situation under the circumstances as he believes them to be. An emotional disturbance is excusable, within the meaning of this paragraph, if it is occasioned by any provocation, event or situation for which the offender was not culpably responsible.

Final Report of the National Commission on Reform of Federal Criminal Laws § 1602, at 174–75 (1970). In its comments, the Commission stated:

> As to 'voluntary manslaughter,' the scope of admissible 'provocation' is broadened to include anything that excusably leads to 'extreme emotional disturbance.' For example, taunts or seduction of female relatives might suffice. But extreme emotional disturbance will not reduce murder to manslaughter if the actor has culpably brought about his own mental disturbance, such by involving himself in a crime, or if the excuse is not reasonable, such as where political events provoke an assassination.

Comment to § 1602 (citations omitted). The Commission additionally printed voluminous working papers. Here, the Commission criticized the common law and existing federal law:

> The rationale [of the present law] is that persons who behave homicidally only under serious provocation do not present so great a threat to general security. Also, it has been argued, if the offender was beside himself with anger or other emotion, it is useless to employ the gravest sanctions against him, as one might hopefully try to deter a coldblooded killer with the threat of capital punish-

It appears from the above that Congress manifested an intent to distinguish between murder and manslaughter by the presence or absence of malice. It is further evident that it was the intent of the legislature that the "sudden quarrel or heat of passion" language retain its common law meaning. Beyond this, the legislative history provides us with little assistance in understanding the statute's intended meaning.

The present standing of the "sudden quarrel" language in federal and state courts [8] is not well-documented.[9] What is apparent is that few courts have interpreted the voluntary manslaughter statute in a consistent manner. Typically, courts quote the statutory language (including "sudden quarrel"), and then continue their discussion solely as it applies to heat of passion. *See e.g., United States v. Collins*, 690 F.2d 431, 437 (5th Cir.1982), *cert. denied*, 460 U.S. 1046, 103 S.Ct. 1447, 75 L.Ed.2d 801 (1983); *United States v. Browner*, 889 F.2d 549, 551–53 (5th Cir.1989); *United States v. Eagle Hawk*, 815 F.2d 1213, 1215–16 (8th Cir.1987), *cert. denied*, 484 U.S. 1012, 108 S.Ct. 712, 98 L.Ed.2d 662 (1988); *United States v. Elk*, 658 F.2d 644, 648 (8th Cir. 1981). In these cases, the courts provide no insight or analysis as to the meaning of "sudden quarrel". Some standard jury instructions treat the manslaughter statute in the same manner. *See e.g.*, 1A L. Sand, *et al.*, Modern Federal Jury Instructions ¶ 41.02, Instr. 41–17, 41–18 and comments (1992). Other courts apparently blend the terms together by instructing that the jury must find the defendant to have acted "in sudden passion" or "upon sudden quarrel in heat of passion". In fact, one court has ruled that the term is so obvious as to require no explanation at all. *See e.g., United States v. Hardin*, 443 F.2d 735, 738–39 (D.C.Cir.1970) ("the words 'mutual combat' ... are sufficiently self-explanatory so as to not require elaboration by the court to convey their intent to a reasonably intelligent jury").

What little case law exists apparently indicates that the two terms—"sudden quarrel" and "heat of passion"—do not retain distinct meanings. Some courts treat "sudden quarrel" as a type of provocation causing one to kill in the heat of passion. For example, in *United States v. McRae*, 593 F.2d 700 (5th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979), the trial court read the federal manslaughter statute to the jury, but later omitted the "sudden quarrel" language when defining the elements of proof. The defendant appealed his conviction, and the court of appeals affirmed. Doubtful as to whether the two aspects of voluntary man-

---

ment. The violently moved killer is beyond such calculations. Therefore, considerations of humanity and 'economy in punishment' call for mitigation.

*Existing Federal law is, however, defective in several respects. The 'sudden quarrel or heat of passion' formula may have been adequate when all murder was punishable by death, but it is too loose in the present day legal context. One who intentionally and coldbloodedly kills another with whom he is quarreling is a proper candidate for a murder conviction.* 'Heat of passion' is an antique phrase misleading to a jury without qualifications about what caused the passion, which the courts have read into the statute. On the other hand, the judicially created rules need revision too.... Working Papers of the National Commission of Reform of Federal Criminal Laws, at 827–28 (Vol. II 1970).

Drafts of the manslaughter statute introduced in Congress differed with respect to whether the killing was "reckless" or "knowingly." These alternative drafts, however, were consistent in that they omitted the "sudden quarrel or heat of passion" language; rather, the murder and manslaughter statutes provided a defense to murder where the death was caused under circumstances, for which the defendant was not responsible, which caused the defendant to lose self-control and that would likely cause an ordinary person to lose self-control to at least the same extent. *See e.g.*, S.Rep. Nos. 1722, 1723, 96th Cong., 1st Sess. (1971). These proposed changes to the criminal code were never enacted.

8. The "sudden quarrel" or "sudden affray" language persists in some state statutes, *see e.g.*, Cal. Penal Code § 192 (West 1986); Idaho Code § 18–4006 (1984); N.M.Stat.Ann. § 30–2–3 (1963); K.S.A. 21–3403 (1970), although others no longer retain this language. *See* Ky.Rev.Stat. § 507.030 (1974).

9. "Sudden quarrel" is also known as "sudden affray", "mutual combat", or "sudden combat." We use these terms interchangeably.

slaughter were discrete from one another, the court reasoned:

> The phrase 'sudden quarrel' is probably the direct descendant of the 'sudden affray' element of the common-law offense.... In its literal, nonhistoric meaning, it is surely not the quarrel that signifies but the heat of passion that it occasions. Manifestly, a mere feigned quarrel, without passion, would be no excuse whatsoever.

*Id.* at 705. Additionally, the court ruled that under the facts of the case, the trial court's emphasis on heat of passion caused by adequate provocation was justified. *Id.*[10]

Some state courts employ a similar reading of voluntary manslaughter. For example, in *Commonwealth v. Peters*, 372 Mass. 319, 361 N.E.2d 1277 (1977), *overruled on other grounds, Commonwealth v. Aponte*, 391 Mass. 494, 462 N.E.2d 284 (1984), the Supreme Judicial Court of Massachusetts reasoned that "sudden combat is readily understood to be one of the events which may provoke the perturbation of mind that can end in a killing without malice." 372 Mass. at 324, 361 N.E.2d at 1280 (citing Perkins, Criminal Law 57–59 (2d ed. 1969)). Likewise, in *State v. Coop*, 223 Kan. 302, 573 P.2d 1017 (1978), the defendant argued that "heat of passion" and "sudden quarrel" were separate and should be considered each on its own merits. The Supreme Court of Kansas, noting that the Kansas statute derived from the federal code, reasoned:

> [I]f we use words such as "sudden combat" and "sudden affray" to have similar meanings as "sudden quarrel," we see that for the most part it is not truly a separate creature. It is merely one of the means of provocation which brings on heat of passion.... [A] sudden combat is ordinarily considered on the same footing as other provocations operating to create such passion as temporarily to unseat the judgment.

223 Kan. at 305–06, 573 P.2d. at 1020 (citing 1 Wharton's Criminal Law and Procedure § 280; Perkins on Criminal Law, at 57–59; 40 Am.Jur.2d, Homicide § 61; 40 C.J.S. § 42) (quotations omitted). Other states agree that "sudden quarrel" is a type of provocation causing one to act out in the heat of passion. *See e.g., State v. Pettit*, 233 Neb. 436, 445 N.W.2d 890 (1989) (sudden quarrel is legally recognized as sufficient provocation causing reasonable person to lose normal self-control); *People v. Leonard*, 83 Ill.2d 411, 47 Ill.Dec. 353, 415 N.E.2d 358 (1980) ("mutual combat has been recognized in Illinois as adequate provocation, sufficient to reduce the offense to voluntary manslaughter"); *State v. Inger*, 292 N.W.2d 119 (Iowa 1980) (provocation resulting from mutual combat); *State v. Smith*, 123 N.H. 46, 455 A.2d 1041 (1983) (mutual combat constitutes adequate provocation).

We recognize that some jurisdictions have treated the "sudden quarrel" and "heat of passion" terms distinctly. In Kentucky, for example, the courts interpreted the Kentucky voluntary manslaughter statute—"in a sudden affray, or in heat of passion"—as providing two separate circumstances in which a defendant could be convicted for manslaughter. *See Richards v. Commonwealth*, 517 S.W.2d 237 (Ky.Ct. App.), *cert. denied*, 422 U.S. 1010, 95 S.Ct. 2635, 45 L.Ed.2d 674 (1975); *Young v. Commonwealth*, 256 S.W.2d 535 (Ky.Ct. App.1953); *Violett v. Commonwealth*, 24 Ky.L.Rptr. 1720, 72 S.W. 1 (1903); *accord Burris v. Commonwealth*, 308 Ky. 145, 213 S.W.2d 1014 (1948) (jury instruction improper where instruction charged "heat of passion" and indictment only charged "sudden affray"). The Kentucky statute, however, has since been amended to define manslaughter using the term "extreme emotional disturbance." Ky.Rev.Stat. § 507.030. Additionally, some California courts have viewed the terms as separate elements. In *People v. Ross*, 34 Cal.App.2d 574, 93 P.2d 1019 (1939), the court of appeals stated:

---

**10.** In *McRae*, the defendant, who had argued with his wife earlier that day, shot his wife through the head with a deer rifle while she was sitting on a chair in the living room. *Id.* at 701–02.

Voluntary manslaughter is the unlawful killing of a human being, without malice, upon a sudden quarrel or heat of passion. The law requires the existence of but one of these conditions, as provocation to reduce a felonious homicide from murder to manslaughter....

34 Cal.App.3d at 579, 93 P.2d at 1022; *see also People v. Whitfield,* 259 Cal.App.2d 605, 66 Cal.Rptr. 438 (1968). However, a look at other California decisions reveals a number of inconsistent interpretations of the "sudden affray" and "heat of passion" language. *See People v. Pacheco,* 116 Cal. App.3d 617, 172 Cal.Rptr. 269 (1981); *People v. Perrotta,* 224 Cal.App.2d 498, 36 Cal.Rptr. 813 (1964); *People v. Small,* 7 Cal.App.3d 347, 86 Cal.Rptr. 478 (1970); *People v. Dugger,* 179 Cal.App.2d 714, 4 Cal.Rptr. 388 (1960); *People v. Sedeno,* 10 Cal.3d 703, 112 Cal.Rptr. 1, 518 P.2d 913 (1974), *overruled on other grounds by People v. Flannel,* 25 Cal.3d 668, 160 Cal. Rptr. 84, 94, 603 P.2d 1, 11 (1979); *People v. Best,* 13 Cal.App.2d 606, 57 P.2d 168 (1936). Due in large part to their disparity, we do not find these cases to be particularly helpful.

We also note a recent text which assigns a distinct meaning to the term "mutual combat": "[w]here two persons willingly engage in mutual combat, and during the fight one kills the other as the result of an intention to do so formed during the struggle, the homicide has long been held to be manslaughter, and not murder, the notion being that the suddenness of the occasion, rather than some provocation by the victim, mitigates the intentional killing to something less than murder." 2 Wayne R. La-Fave and Austin W. Scott, Substantive Criminal Law § 7.10(b)(2) at 256 (1986).

In light of the foregoing discussion, it may be arguable that the "sudden quarrel" term is an anachronism with no meaning not adequately served by a proper definition of heat of passion. We need not go so far to justify the omission of the term from the instruction in this case. Even if the

term retains its historic meaning, Garcia (the only defendant to brief this issue) was not entitled to the instruction requested. He was not one of the two persons who may have been willingly engaged in mutual combat. Rather, he entered the ongoing encounter for the purpose of aiding one of the combatants. Likewise, Noel was not entitled to the instruction here. He entered the fight for the purpose of aiding Martinez. Nor do we believe that Martinez was entitled to the instruction, although arguably, Martinez initially engaged in a fist fight with Sammons that could fall within the meaning of a "sudden quarrel". However, once Garcia and Noel joined in and a knife entered the picture, the attack escalated into something very different from a "mutual combat" or "sudden quarrel."

B. Refusal to Instruct that Prior Sworn Inconsistent Statement is Probative of its Truth

 At the jury instruction conference, the district court proposed to instruct the jury regarding prior inconsistent statements:

Evidence that on some former occasion a witness made a statement inconsistent with his or her testimony in this case may be considered by you only in determining the credibility of the witness and not to establish the truth of the matters contained in that prior statement.

Counsel for Martinez objected to the proposed instruction and requested the following addition: "unless the statement was under oath in a prior proceeding and then it can be considered for its truth." In this context, counsel for Martinez mentioned Williams' testimony, cited Rule 801, and stated that "it is not hearsay if it was under oath in a prior proceeding." Tr. at 4-A-62. The district judge denied Martinez' addendum. We believe the addition was a correct statement of law under Federal Rule of Evidence 801 and should have been given.[11]

---

11. Federal Rule of Evidence 801, upon which counsel relies, provides in pertinent part:

A statement is not hearsay if ... [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the

At trial, the officers had given estimates of elapsed time, but admitted that at a pretrial evidentiary hearing they had given estimates which defendants argued were inconsistent and showed that the time had been shorter. This issue has significance in that it relates to whether the defendants formed malice aforethought, an element to be proved in order to convict for murder.[12] It also relates to whether the defendants formed malice, necessary for second degree murder. The parties treat the presence or absence of this element in terms of intent, and we use that language here. During closing arguments, the prosecutor argued that the defendants had sufficient time in which to form the intent to kill. In this context, the prosecutor argued that the assault lasted between approximately seven and eight minutes. Tr. 4–B–17. The defendants argued that they could not have formed the intent to kill because the interval from the time the knife was first used until the end of the affray was very short. Although the testimony shows that Martinez and Garcia continued viciously to kick and beat Sammons and Brown, even after the latter had been rendered defenseless, Martinez appears to contend that only the knife produced death and he cannot be held responsible for the fatal wounds unless he had time to learn about Noel's use of the knife and then form an intent to join with him. In this context, counsel for Martinez argued that the entire fight took only four to four and three-quarter minutes. Tr. at 4–B–95.

On appeal, Martinez argues that if the jury had been permitted to treat the Williams and Glattfelder pre-trial testimony as substantive evidence, the lapse of time during which the knife was used could have been determined to be significantly shorter (and thus to have provided less opportunity to reach the required intent). He breaks the episode into three parts: I,

while Glattfelder was on the scene alone, and there was only a fist fight between Sammons and Martinez; II, from the time Glattfelder left the immediate scene until he and the other officers arrived; and III, from that arrival until the encounter ceased. Part I was estimated at 30 to 45 seconds, and need not be considered in connection with the argument now being resolved. Martinez asserts that, according to the Williams–Glattfelder testimony, Part II lasted 90 to 120 seconds, Part III 150 to 180 seconds, and the maximum time the knife was used 240 to 300 seconds—or four to five minutes. Using the pre-trial testimony, he contends that Part II lasted 60 seconds, Part III 45 to 60 seconds, and the maximum knife-time 105 to 120 seconds—or one and three-quarters to two minutes.

The instruction as given told the jury, in effect, that the earlier statements, if inconsistent, could be considered in .deciding whether to believe the Williams–Glattfelder estimates at trial, but could not be relied on to find that the time lapse had been as short as the earlier statements indicated. Because the earlier statements had been given under oath in a prior proceeding, the jury should have been told that it could consider them as true, if inconsistent.

■ The Government urges us to apply the heightened "plain error" standard here due to Martinez' failure to state an objection with sufficient clarity. *United States v. Briscoe*, 896 F.2d 1476, 1513 (7th Cir.), *cert. denied*, 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990); *United States v. Canino*, 949 F.2d 928, 940 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1701, 118 L.Ed.2d 410 (1992); Fed.R.Crim.P. 52(a). Regardless of the standard applied, the Government continues, the instruction was proper because the prior statements upon which the defendants rely are consistent with the trial testimony.

statement, and the statement is [ ] inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding.... Fed.R.Civ.P. 801(d)(1)(A).

**12.** The district court instructed "that malice aforethought means an intent at the time of a killing, to willfully take the life of a human being, or an intent willfully to act in callous and wanton disregard of the consequences of human life; but malice aforethought does not necessarily imply any ill will, spite, or hatred towards the individual killed."

The Federal Rules of Criminal Procedure provide that no party may assign as error any portion of the charge unless the party objects before the jury retires, "stating distinctly the matter to which that party objects and the grounds of the objection." Fed.R.Crim.P. 30. "The objection must point to something particular in the instruction and identify what, particularly, is wrong, and why; nothing else alerts the judge to what is at stake." *United States v. Kehm*, 799 F.2d 354, 362–63 (7th Cir. 1986); *Guerts v. Barth*, 892 F.2d 622, 624 (7th Cir.1989) (when objecting to proposed instruction litigant must identify evidentiary deficiencies to support objection); *see also United States v. Requarth*, 847 F.2d 1249, 1252 (7th Cir.1988). So long as the district judge is apprised of the grounds for the objection, however, a litigant is not required to adhere to "formalities of language and style." *Willits v. Yellow Cab Co.*, 214 F.2d 612, 616 (7th Cir.1954), *quoted in Guerts*, 892 F.2d at 624 (applying Fed.R.Civ.P. 51).

The Government argues that Martinez's objection was insufficient because he "merely guessed" at the identity of the witness, because his objection stated an incomplete formulation of Rule 801, and because he failed to explain why Williams' prior testimony was inconsistent. At the jury instruction conference, counsel for Martinez specified the portion of the instruction to which he objected and provided an addendum. He additionally referred to the applicable rule of evidence and specified the witness to whom the proposed instruction applied. Counsel stated clearly that he believed Williams' prior testimony could be used for its truth. Any uncertainty in his phrasing, "I think it was Williams," is insignificant. It is apparent that the Government, in its rejoinder that "that evidence was offered for impeachment purposes," was aware of the nature of the objection. Although counsel did not quote the particular portion of Williams' testimony upon which he relied, nor elabo-

rate upon the reason for its inconsistency, we find his objection sufficiently distinct to satisfy the requirements of Rule 30. *See e.g., United States v. Pacione*, 950 F.2d 1348, 1355 (7th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 3054, 120 L.Ed.2d 920 (1992).

An instruction need be given only when it addresses an issue reasonably raised by the evidence. *United States v. Valencia*, 907 F.2d 671, 679 (7th Cir.1990); *United States v. Diaz*, 864 F.2d 544, 549 (7th Cir.1988), *cert. denied,* 490 U.S. 1070, 109 S.Ct. 2075, 104 L.Ed.2d 639 (1989); *United States v. Talkington*, 875 F.2d 591, 595–96 (7th Cir.1989). The government argues that Williams' pre-trial answer was not really inconsistent with his testimony at trial.

At trial, Williams testified on direct that he had pushed down the B-range hall through the inmates with other officers, and had seen Noel and the others involved in the encounter when he reached the front of the crowd. After some observations, which he described at trial, Schirmer told him to get the crowd of inmates out of B-range and into A-range.[13] This involved some pushing and when he and the other officers "almost had them in A–Range ... I went back." He estimated that the locking down process took approximately two to three minutes. He described an observation he made during the pushing operation when he turn and looked back. On cross-examination by Martinez' counsel, the following colloquy took place:

> Q. From the time you broke through the inmates until you stopped seeing any kind of interaction between Garcia, Martinez, Noel and Sammons and Brown, yes sir.
>
> [An earlier question made it evident that counsel was questioning Williams about the duration of the fight 'from the time that you first broke through the inmates until the incident came to an end....']

---

**13.** The Portage Unit is comprised of two wings, designated as the A and B range. The A-range is adjacent to the B-range, joined in the middle by an officer's station, television room and show-ers. Tr. at 1–B–7–9. Each wing has 28 cells with 14 cells on each side of an 8 to 10 foot wide hallway.

A. It is hard to tell, but I think it is approximately two to three minutes by the time I got back down to the range, B-range.

Counsel then read the following questions and answers from the pre-trial hearing:

Q. 'At the point at which you had finished clearing the remaining inmates out of the hall, did you see anything further of the assault that was taking place?'

A. 'No, sir.'

Q. 'How long a time do you estimate that you had observed the assault itself going on?'

A. 'I'd say approximately 45 seconds to a minute, sir.'

Tr. 2-A-141.

There is no clear inconsistency. The answer given at trial covered the period when Williams was on the immediate scene, followed by a period of pushing the other inmates down the hall, followed by Williams' return to B-range. The second answer, given at the pre-trial hearing, estimated only the time he "had observed the assault itself going on", a period which was within the period asked about at trial, but the latter also included the period when Williams was pushing other inmates down the hall toward A-range.

On the other hand, the prosecutor did not argue to the district court that the pre-trial testimony was not inconsistent. Rather, he stated, "That evidence was offered for impeachment purposes only....", virtually a concession that it could be interpreted, at least, as inconsistent, and the district court indicated agreement with the prosecutor.

Martinez further contends that this omission from the instruction was relevant to Glattfelder's prior inconsistent testimony, as well. Because counsel's objection rested solely on Williams' testimony, we review the court's failure to instruct—as applied to Glattfelder's testimony—for plain error. At trial, Glattfelder was asked the following:

Q. Okay. About how long did it take from the time that you hit your body alarm until the response team came

and talked to you inside of Portage Unit?

A. It must have been approximately one and a half to two minutes.

Tr. at 1-B-28. At the suppression hearing, Glattfelder testified:

A. I hit my body alarm and announced I have a fight on B range. This is Officer Glattfelder. It's Portage.

Q. What did you do then?

A. .... I proceeded back down the range toward the entrance near the officer's station because I knew responding staff would be coming from that direction and I would need to direct them from there.

Q. And did staff arrive then?

A. Yes, momentarily. It should have been within a matter of probably less than a minute.

Tr. at 1-B-35.

Inconsistency is a closer question here. The trial testimony estimated one and one-half to two minutes for the period from Glattfelder's alarm to the arrival of and conversation with the team of officers. The pre-trial testimony estimated less than a minute for the period from the alarm (or possibly from Glattfelder's arrival at the entrance) to the arrival of the staff. It may be argued that the pre-trial testimony covered a period which began slightly later (to the extent of the time it took Glattfelder to push through the crowd of inmates) and ended slightly earlier (to the extent of any time that the team talked with Glattfelder after arrival). Even if construed as covering identical time periods, the difference could be no more than one minute.

But even assuming that it was error to refuse the addition to the instruction, and that the Williams and Glattfelder pre-trial answers were inconsistent and could have been relied on as substantive evidence, we think the error was harmless. We deem it most improbable that the jury relied on these time estimates in assessing whether the defendants acted with malice aforethought, or whether Martinez and Garcia acted in concert with Noel. At trial, a number of witnesses testified as to the events that took place on the night in ques-

tion. By taking the witnesses' accounts into consideration, the jury could understand the time that must have passed in order for these events to have transpired. We have no doubt that the description of events was more persuasive to the jury than Williams' and Glattfelder's estimates of the time that elapsed during the encounter. Accordingly, we hold that the rejection of the proffered addendum worked no prejudice on any defendant.

C. Exclusion of Evidence of the Victims' Violent Character, Prior Acts and Racist Attitudes and Affiliations

Much of the defendants' arguments are directed at the exclusion of evidence of Sammons' and Brown's racist views and past violent acts, many of which were directed at minorities. The defendants contend that the victims' racist views and violence toward minorities are significant in this case because Martinez and Garcia are hispanics and Sammons and Brown are non-hispanic whites. Noel is a non-hispanic white, but the friend of Martinez and Garcia.

However, substantial proof bearing on the victims' past violence did come in at trial. Noel testified that Hammer (Sammons' nickname) enjoyed a reputation as a fighter, Tr. 3-B-31, and that the people he hangs out with beat up other inmates. Tr. 3-B-32. Noel testified that Sammons "beat the shit out of" Noel's cellmate Martin. Tr. 3-B-31. Additionally, an officer testified that in his presence Sammons had hit inmate Soria in the face and back while Soria was handcuffed. Tr. 4-A-44. Another officer testified that in his opinion Brown is a violent individual. Tr. 3-B-104. Likewise, an inmate testified that, in his opinion, Sammons was a violent person. Tr. 3-B-139.

Defendants were less successful in trying to show the victims' affiliations with racist organizations and that instances of their violence involved minority persons. Although Brown admitted he was a member of the Dirty White Boys, Tr. 2-B-112, the court sustained an objection when he was asked whether, as such, he espoused

hatred against minority groups. Tr. 2-B-125. The court also rejected Noel's offer to prove that Brown had made derogatory remarks about minorities and that Sammons had told Noel he was a white supremacist. Tr. 3-B-79. However, testimony did come in that two of the tattoos on Sammons' body were swastikas. Tr. 3-A-80. Additionally, there were other pieces of evidence of similar import which were excluded or struck. The court would not permit testimony as to the race of Mr. Soria, the handcuffed inmate beaten by Sammons, Tr. 4-A-44, nor testimony by Noel that Sammons told him of beating a minority, perhaps referring to the same incident.

■ Although the additional evidence of the victims' past violent acts might be deemed cumulative, exclusion of the evidence of their racism cannot be disposed of on that ground. We have carefully examined the challenged exclusions, and deem it unnecessary to discuss the details of every one. Some of the rulings were justified on such grounds as lack of foundation, hearsay, or failure to make a proper offer of proof. However, many were explicitly based on lack of relevance. In some instances, the theory of relevancy was, for example, that because Brown had possessed shanks on earlier occasions, he, rather than Noel, probably introduced the shank to this encounter. Evidence offered on that or similar theories was clearly inadmissible under the first sentence of Federal Rule of Evidence 404(b).

■ In some instances, the theory may have been that the victims' traits of violence and racism were relevant as to whether defendants acted in self-defense or necessary defense of another, and therefore admissible under Rules 404(a)(2) and 405(b). *See United States v. Greschner*, 647 F.2d 740, 742 (7th Cir.1981); *but see United States v. Whalen*, 940 F.2d 1027, 1034 (7th Cir.1991). Even assuming relevance to self-defense, exclusion could not be prejudicial in the present circumstances. Before Garcia entered the fight, Martinez may well have been acting in self-defense. Likewise, when Garcia entered the fight he

may have been acting in necessary defense of Martinez, who apparently was getting the worst of it. Noel testified that he entered the fight after Brown grabbed Martinez around the neck and at that stage he may have been acting in necessary defense of Martinez. Any threat to Martinez did not last. In most of the encounter, Brown was down and unconscious or nearly so. As well, Sammons was on the floor and offered little resistance. This was the way things were when the assisting officers first broke through the crowd of inmates and reached the immediate area of encounter. Although the officers repeatedly ordered them to stop, the defendants continued the attack, with Noel stabbing both victims many times—including the fatal wounds of Sammons—while Martinez and Garcia kicked and beat both. In addition, there was testimony that Martinez and Garcia assisted Noel in the stabbing. Assuming that the excluded evidence would have been relevant to self-defense, exclusion could not have been prejudicial under these circumstances, where there could not have been a rational finding of self-defense.

 Moreover, a theory argued by defendants on appeal, but not articulated on the trial record, is that defendants' awareness of the victims' traits of violence and racism were relevant to the defendants' state of mind when provoked into heat of passion. Where the grounds for admission of evidence are not readily apparent, counsel should alert the court to his theory, and failure to do so is reason enough for the appellate court to confine its review to plain error. *United States v. Peak*, 856 F.2d 825, 832 (7th Cir.), *cert. denied*, 488 U.S. 969, 109 S.Ct. 499, 102 L.Ed.2d 535 (1988) (offer of proof should demonstrate the significance of the excluded testimony); *Young v. Rabideau*, 821 F.2d 373, 376 (7th Cir.), *cert. denied*, 484 U.S. 915, 108 S.Ct. 263, 98 L.Ed.2d 221 (1987) (proponent needs to alert the trial court to the issue).

As Judge Shabaz instructed, "Provocation [of heat of passion], in order to be adequate, must be such as might naturally cause a reasonable person in the passion of the moment to lose self-control and act on impulse and without reflection." *Cf.* LaFave, *supra* at 252; *United States v. Collins*, 690 F.2d 431, 437 (5th Cir.1982). If the jury found that the defendants did not lose self-control, the adequacy of provocation would be irrelevant and exclusion of evidence relevant to it clearly harmless. Thus, we will assume the jury found no adequate provocation, and consider any possible relevance of the excluded evidence as to the adequacy of provocation.

Under the circumstances, the immediate provocation of Martinez was the blows he received from Sammons early in the fight. The objective test is whether a reasonable person in the same circumstances would lose control. If the blows themselves would not be adequate, would they be adequate if struck by a person known to be violent and to be motivated by racism? The immediate provocation of Garcia is his observation of Sammons beating Martinez. If seeing his friend beaten was not enough to make a reasonable person lose control, would a reasonable person's awareness of Sammons' racism and violence make a difference? Likewise, Noel testified that he was a bystander when he saw Brown grab Martinez. According to Noel's testimony, he hit Brown and pulled him off Martinez. When Brown advanced on Noel with a "pick" in his hand, Noel hit Brown and slammed him into the wall (effectively removing him from combat). Brown dropped the pick and Noel recovered it. According to Noel, he then "kind of lost it.... I just started going crazy." Noel recalled little after that. If his observations of Brown were not enough to make a reasonable person lose control, would a reasonable person's awareness of Sammons' and Brown's racism and violence make a difference?

The parties have not cited, and we have not found, any decisions dealing with this or a similar issue. On provocation generally, *see* LaFave, *supra* at 255–64. Although infliction of violent painful blows may be adequate provocation, LaFave, *supra* at 256, we doubt that a defendant's awareness of his adversaries' violent past and

racist motivation are the type of factors to be considered. In any event, we find it most improbable that the evidence excluded in this case would have caused the jury (which had evidence of the victims' violence before it) to reach a different conclusion. Assuming for purposes of appeal that there was error, it was harmless.

■ Alternatively, the defendants contend that the Government "opened the door" to the issue of Sammons' and Brown's character. In particular, the defendants rely upon a question posed to Glattfelder at trial. During direct examination, the prosecutor asked Glattfelder whether he "had ever run into any previous problems with Charles Sammons." Glattfelder responded "none whatsoever", and also indicated the same as to Brown. The defendants argue that they were not permitted to rebut this testimony by placing prior act evidence before the jury and, therefore, their inability to introduce rebuttal evidence impermissibly permitted a one-sided picture of Sammons and Brown.

■ The "open the door" or "invited error" doctrine provides that where a proponent introduces inadmissible evidence, a court may permit the opponent to introduce similarly inadmissible evidence in rebuttal or engage in otherwise-improper cross-examination. A court may apply the "opening the door" doctrine in order to neutralize or cure any prejudice incurred from the introduction of the evidence:

> [W]here the proponent's inadmissible evidence advances his case or undercuts that of his adversary, or otherwise introduces prejudice to the trial, then in fairness the adversary should be allowed to try to neutralize the effect of this evidence or cure any resulting prejudice by introducing otherwise-inadmissible rebuttal evidence or impeaching the proponent's witness on cross-examination.

1 David W. Louisell & Christopher B. Mueller, Federal Evidence § 11, at 49 (1977). The extent to which an opponent may counter with evidence is within the discretion of the district court.

■ This doctrine, referred to as "curative admissibility", is tempered by the need to place reasonable limits upon the amount and type of rebuttal evidence allowed to come in through the door. *Id.* at 49–50 (citing Wigmore on Evidence § 15 (3d ed. 1940)). Inadmissible evidence is permitted "only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence." *United States v. Winston*, 447 F.2d 1236, 1240 (D.C.Cir.1971) (quotations omitted); *see United States v. Johnson*, 502 F.2d 1373, 1376 (7th Cir.1974), *cert. denied*, 420 U.S. 977, 95 S.Ct. 1402, 43 L.Ed.2d 657 (1975) (doctrine of curative admissibility cannot be "subverted into a rule for injection of prejudice"); *see generally* Louisell & Mueller, *supra*, at 61–64. An "open door" does not give an opponent unbridled license to introduce otherwise inadmissible evidence into the trial, nor does it justify receipt of rebuttal evidence merely because it is in the same category of excludable evidence as the evidence previously offered. Louisell & Mueller, *supra*, at 63. Where the rebuttal evidence does not directly contradict the evidence previously received, or goes beyond the necessity of removing prejudice in the interest of fairness, it is within the district court's discretion to deny its admittance. *Id.*

Here, Glattfelder testified that he did not experience problems with the victims in the past. Although it was within the court's discretion to allow evidence to rebut this testimony, the court was not required to do so. Inadmissible evidence is permitted only to the extent necessary to remove any unfair prejudice resulting from the original evidence. Glattfelder had only been assigned to the Portage Unit one month prior to the April 27 incident. In light of this narrow time frame, his testimony that the victims were not troublemakers carried little weight and was unlikely to prejudice the defendants. Moreover, the jury heard evidence of the victims' misconduct (although these instances may not have been known to Glattfelder). In the absence of prejudice, it was within the district court's discretion to exclude contrary evidence.

D. Admission of Williams' Testimony Concerning One of Two Hispanics

■ Prior to trial, Martinez and Garcia moved to exclude a portion of Williams'

testimony. This motion arose from identification testimony given at a suppression hearing prior to trial. At the hearing, Williams testified that during the fight he observed one of the two hispanics trying to "uncurl" or "open" Sammons as Noel stabbed him. Tr. at 1–B–60, 61. Williams could not identify whether that person was Martinez or Garcia. Martinez and Garcia argued that this portion of Williams' testimony should be excluded in that it was irrelevant because it called for the jury to "speculate" or "flip a coin" as to which hispanic had assisted Noel. The court reasoned that the testimony was "important for a complete understanding of the events that the testimony be provided in that it does, indeed, show the very nature of the attack, and it does show the intent of the Defendants."[14] Tr. 234, at 27. The district court denied the motion, finding that the probative value was not outweighed by any prejudice the defendants might incur. Fed.R.Civ.P. 403.

Martinez argues on appeal that Williams' testimony required the jury to speculate as to which inmate uncurled Sammons, that it was irrelevant to .the issue of intent, and that its inclusion was "grossly" prejudicial. "The district court's determination on the admissibility of evidence will be upheld unless it appears that the court clearly abused its discretion." *United States v. Tipton*, 964 F.2d 650, 654 (7th Cir.1992) (citing *United States v. Covelli*, 738 F.2d 847, 854 (7th Cir.), *cert. denied*, 469 U.S. 867, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984)).

Relevant evidence is evidence having "any tendency to make the existence of any fact ... more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Relevant evidence is generally admissible. Fed.R.Evid. 402; *see United States v. York*, 933 F.2d 1343, 1351 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991) (evidence that increases probability that defendant committed crime is relevant). Here, Williams testified as to his observations during the fight—his comments about the

"unfolding" of Sammons but one link in the chain of events. Williams' testimony provided some assistance to the jury's understanding of the full sequence of events. Regardless of whether it was Martinez or Garcia who unrolled Sammons, the other was kicking Brown in the face. Moreover, Williams' testimony did not stand alone. The general depiction of Williams' testimony corroborated testimony provided by two inmates. Inmate Margiotta testified that while Noel stabbed Sammons, it was Martinez who held him down, Tr. at 2–A–55–56, while Inmate Cummings testified that he observed both Martinez and Garcia "rolling" Sammons. Tr. at 2–A–157–58.

In support of his argument, Martinez relies upon *People v. Collins*, 68 Cal.2d 319, 66 Cal.Rptr. 497, 438 P.2d 33 (1968) (*in banc*) and *Smith v. Rapid Transit, Inc.*, 317 Mass. 469, 58 N.E.2d 754 (1945). We find neither to be persuasive. In *Collins*, a jury convicted defendants, husband and wife, of second degree robbery. At trial, the prosecutor argued that, assuming certain characteristics of the accused, there was an overwhelming probability that the crime was committed by a couple matching their distinctive characteristics. In closing, the prosecutor selected individual probabilities for "illustrative purposes" and invited the jurors to apply their own factors. *Collins*, 66 Cal.Rptr. at 500–01 & n. 10, 438 P.2d at 36–37 & n. 10. Under his theory, one could infer that there could be but one chance in 12 million that defendants were innocent and that another equally distinctive couple actually committed the robbery. *Id.*, 66 Cal.Rptr. at 501, 438 P.2d at 37.

On appeal, the Supreme Court of California, sitting *in banc*, held that the prosecution's introduction and use of mathematical probability statistics injected two fundamental prejudicial errors: first, because the testimony lacked an adequate foundation, the technique employed by the prosecutor "could only lead to wild conjecture without demonstrated relevancy to the issues presented"; and second, the prosecu-

---

**14.** At trial, counsel for Martinez objected and moved to strike for lack of foundation. Tr. at 2–A–118. The district judge overruled this objection as well.

tor's use of this evidence improperly injected fundamental error into the jury deliberation process by "distract[ing] the jury from its proper and requisite function of weighing the evidence on the issue of guilt...." *Id.*, 66 Cal.Rptr. at 502–03, 438 P.2d at 38–39.

In *Smith*, the plaintiff alleged that she collided with a parked car when she was forced off a road by an oncoming bus. To establish that the bus was owned by the defendant, plaintiff presented circumstantial evidence demonstrating that the bus could not have been operated by a different bus line. The trial court granted a directed verdict for the defendant. On appeal, the Supreme Judicial Court of Massachusetts upheld the directed verdict because the ownership of the bus was a matter of conjecture. *Smith*, 58 N.E.2d at 755. The court reasoned, "it is not enough that mathematically the chances somewhat favor a proposition to be proved.... The most that can be said of the evidence in the instant case is that perhaps the mathematical chances somewhat favor the proposition that a bus of the defendant caused the accident. This was not enough." *Id.* (quotations omitted).

*Collins* and *Smith* are not applicable to our case. First and foremost, neither case held that the evidence at issue was inadmissible on relevancy grounds, as counsel argues here. In *Smith*, the court concluded that the evidence presented by the plaintiff—standing on its own—was insufficient, while in *Collins*, the court held that the mathematical probability statistics introduced by the prosecution were inadmissible because they lacked a proper foundation—both in evidence and statistical theory. Moreover, *Collins* and *Smith* are also unpersuasive because we are not faced with an improper use of otherwise relevant evidence. In our case, the Government did not argue to the jury that this evidence, standing on its own, was sufficient to convict the defendants for murder. In response to Martinez' comments during closing arguments (Tr. 4–B–83–84), the Government stated:

> Well, certainly our case is not based on Mr. Williams' testimony alone.... I'm

not asking you to pick apart little bits and pieces of various people's testimony. Believe this, don't believe that; believe this over here, don't believe this.

> I would ask that you consider the cumulative nature of all of the testimony that you've heard because it's all of that testimony that really tells what happened in this case. There were a lot of people watching. Each one of them saw different things. Each one of them might have been watching a slightly different area of the assault at any given point in time, and I think you should consider all of their recollections of that event to put together the picture of what happened.

Tr. 4–B–112–13. We cannot conclude that the introduction of Williams' testimony prejudiced Martinez.

E. Refusal to Permit Argument that a Defendant's Expected Early Release and Family Relationship are Probative on the Issue of Criminal Intent

Prior to the close of trial, the district court addressed objections to closing arguments. Martinez informed the court that he intended to argue to the jury that the short time to his mandatory release date of December 13, 1991 demonstrated that he lacked the intent to kill. Tr. at 4–A–28. In the same vein, Garcia sought to argue to the jury that his release date of November 11, 1991 (applying good time credits), his mandatory release date of March 21, 1992, his marriage and his three children demonstrated a lack of intent to kill and was therefore relevant to his state of mind at the time of the incident. Tr. at 3–B–98. The court ruled that such evidence, admitted for background purposes only, could not be argued to the jury on the issue of intent. Tr. at 4–A–33, 35.

Defendants Martinez and Garcia contend that the district court erroneously precluded them from arguing to the jury that their upcoming release dates and familial status (as applied to Garcia) were relevant to the question of intent. In essence, the defendants' contention is that an inmate who is soon to be released from prison (and perhaps returning to a spouse and child) would

not jeopardize his ability to obtain freedom by killing another—and therefore is unlikely to have formed the intent to kill. In any criminal case, a defendant is faced with a unique set of circumstances contributing to his enjoyment of life at the time of the alleged crime—whether it be his or her upcoming release date, family life, employment opportunities, financial or social status, etc. These considerations could arguably be relevant to whether he or she intended to commit the crime—because logically one would not engage in an activity that would potentially cause him or her to be deprived of that which is valued. This theory is, at best, speculative. Additionally, it would require a degree of reflection which is squarely inconsistent with defendants' contention that they had lost control of their actions. The district court's ruling was not an abuse of discretion.

F. **Request for Dismissal of Indictment Because of Unsupported Statement of Involvement with Mexican Mafia**

 At the grand jury proceedings, a grand juror asked what started the fight. A special agent testified that there was "bad blood" between the "Dirty White Boys" and a Mexican group. In this context, the special agent stated, "[o]ne of them is the Mexican Mafia and there's these other groups." Although the prosecutor elicited testimony from the special agent that this testimony was speculative, he did not admonish the grand jury to disregard this testimony, nor advise the jury not to draw an inference that Martinez was a member of the Mexican Mafia. At trial, the Government made no reference to the Mexican Mafia. Martinez moved for dismissal of the indictment, arguing that the reference to the Mexican Mafia was prejudicial. The district judge denied his motion.

On appeal, Martinez calls our attention to this reference to the Mexican Mafia, without proof that he was a member of the group. He concedes "that there are many cases holding that a legally sustainable petit jury verdict of guilt purges whatever taint there may be in the process by which the indictment was returned." Martinez'

Brief, at 32; *see United States v. Mechanik,* 475 U.S. 66, 73, 106 S.Ct. 938, 943, 89 L.Ed.2d 50 (1986); *United States v. Daniels,* 848 F.2d 758, 759 (7th Cir.1988). He does suggest we exercise our supervisory powers.

At the very worst, the agent's use of language was careless, and any taint unlikely. Unsupported implications should always be avoided, but we see no occasion for other supervisory action than to urge that care be exercised.

For the foregoing reasons, the judgments of the district court are AFFIRMED.

CUDAHY, Circuit Judge, concurring.

I agree, although not without some doubts, that these verdicts should stand. I write separately because there are some aspects of the voluntary manslaughter instruction that merit additional comment.

How the jury should have been instructed presents a vexing problem since the defendants merely asked for an instruction using the statutory language, ordinarily an unexceptionable request. Specifically, the request was for an instruction containing the statutory phrase *"[u]pon a sudden quarrel* or heat of passion." 18 U.S.C. § 1112(a) (1992) (emphasis added). The majority, pursuing an enlightening historical analysis, entertains the possibility that "upon a sudden quarrel" may have no meaning in the modern context apart from being another way of saying "heat of passion." *Ante* at 696.

"Heat of passion" summons up images of the cuckolded husband arriving in the bedroom to find wife and lover *in flagrante delicto.* "Upon a sudden quarrel" has no such well-known referent, but the majority suggests a case, from a much earlier age, of armed disputants whose tempers flair. But I think it is unnecessary to hold that the phrase is without any meaning of its own in a more recent context. Perhaps, consistent with the stereotype of heat of passion killing, we should imagine gunslingers confronting each other in the middle of Main Street over the virtue of a local lady. Such an encounter has

some overtones of self-defense, and the accompanying fear, as well as of rapidly surging anger and enmity, that could provoke a reasonable person to kill. The prevailing emotion in a sudden quarrel might be fear in contrast to a heat of passion situation where envy and jealousy are frequently the key.

But, if a gunslinging encounter is an accurate guess at what a sudden quarrel might look like in "modern" dress, the present facts do not seem to fit the mold. Here we have a fist fight with a deadly weapon introduced into the fray later. This is no doubt a quarrel, but is it sudden? It seems to me that the suddenness with which a fight flairs into potential homicide is critical and must be narrowly construed if "sudden quarrel" is not to become a very broadly applicable defense in homicide cases.[1] Nevertheless, I would be cautious about the majority's speculation that in modern garb "upon a sudden quarrel" may have the same meaning as "in the heat of passion." I do not believe that the two phrases have the same meaning nor would this be a good reason for deleting "upon a sudden quarrel" from jury instructions generally in manslaughter cases.

A "sudden quarrel" and "heat of passion" are two categories of provocation that the present federal statute recognizes as mitigating what would otherwise be murder. As noted, the majority suggests that these two categories may really be the same: "Other states agree that the 'sudden quarrel' is a type of provocation causing one to act out in the heat of passion." *Ante* at 695. To me, however, it is not so much that a sudden quarrel may arouse a kind of heat of passion in the combatants, but that certain, admittedly infrequent, quarrels[2] are themselves sufficient provocation to reduce murder to manslaughter. There are circumstances where the flair-up of a sudden quarrel is so rapid and overwhelming as to provide a defense and require an instruction in a homicide prosecu-

tion. This does not, however, seem to be such a case. In fact, giving the "sudden quarrel" instruction here could mislead the jury. Therefore, I believe that the district court was justified in declining to give such an instruction.

---

1. Whether the defendant is one of the original combatants or an intervenor should not be *per se* determinative. The suddenness with which one becomes involved in an armed skirmish is the key.

2. The cases cited by the majority use the appellation "mutual combat." *Ante* at 695.