18CA1659 Peo v Gonzales 10-07-2021 COLORADO COURT OF APPEALS Court of Appeals No. 18CA1659 Adams County District Court No. 15CR1629 Honorable Francis C. Wasserman, Judge Honorable Donald S. Quick, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Nickey Joe Gonzales, Defendant-Appellant. JUDGMENT AFFIRMED IN PART, VACATED IN PART, AND CASE REMANDED WITH DIRECTIONS Division I Opinion by JUDGE KUHN Dailey and Dunn, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced October 7, 2021 Philip J. Weiser, Attorney General, Christine Brady, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee Megan A. Ring, Colorado State Public Defender, Jessica Sommer, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant 
1 ¶ 1 Defendant, Nickey Joe Gonzales, appeals the judgment of conviction entered after a jury found him guilty of second degree burglary and first degree criminal trespass. We vacate in part and affirm in part. I. Background ¶ 2 Gonzales was charged with stalking and first degree criminal trespass after an incident at the victim’s condo. The year before the incident, Gonzales and J.G. had divorced after a decade of marriage. Following the divorce, they continued to live together and tried to patch up their relationship. When things didn’t work out, J.G. rented a condo and took on T.D. as her roommate. ¶ 3 J.G. and Gonzales stayed in touch following the divorce, and it was “fairly common” for them to text back and forth. According to J.G.’s trial testimony — which was often inconsistent with her prior statements to law enforcement — Gonzales visited the condo occasionally, stayed overnight sometimes, and kept some possessions there. ¶ 4 The Wednesday prior to the incident, Gonzales contacted J.G. about picking up some of his items from the condo. J.G. agreed to let him come over that Sunday to pick up the items. 
2 ¶ 5 Over the next few days, Gonzales’ texts became “increasingly desperate” and over a twenty-four-hour period, Gonzales sent approximately 130 text messages. When J.G. stopped responding to his texts, he showed up at her condo unannounced and knocked on the front door. ¶ 6 Thinking Gonzales was someone else, J.G.’s roommate, T.D., answered the door. Gonzales — who had a “deer in the headlights” look on his face — pushed the door open, walked inside, and searched the condo for J.G, who was not there. ¶ 7 Finally, after the roommate told him to leave three times, Gonzales grabbed the house phone, walked outside, and called J.G. The roommate called 911. The police arrived and arrested Gonzales. ¶ 8 As pertinent here, the prosecution charged Gonzales with first degree trespass for entering or remaining in the condo unlawfully and second degree burglary for doing so with the intent to commit the crime of stalking — serious emotional distress. ¶ 9 To prove the burglary charge at trial, specifically the element that Gonzales intended to commit the predicate crime of stalking — serious emotional distress, the prosecution highlighted the contents 
3 of the text messages and elicited testimony that J.G. told an officer on the day of the incident that she was scared of Gonzales. In support of the trespass charge, the prosecution introduced evidence that Gonzales wasn’t on the lease, that he didn’t have a key, that J.G. told him he wasn’t welcome there that day, that J.G. told the roommate to call the police if he came to the condo, and that the roommate repeatedly asked him to leave. ¶ 10 Gonzales’ theory of defense was two-fold. First, he contended that he didn’t enter or remain in the condo unlawfully. The defense argued that by knocking on the door, Gonzales intended to enter the apartment lawfully and that, from his perspective, he had an “open invitation” to go inside when the roommate opened the door. Additionally, the defense contended that Gonzales didn’t comprehend the roommate’s first two requests to leave but left the condo immediately when he realized she wanted him out. The defense also highlighted that, prior to the day of the incident, Gonzales had never been declined entrance into the condo. ¶ 11 Second, the defense contended that Gonzales did not have the intent to commit the predicate offense of stalking. The defense pointed out that the text messages weren’t threatening and argued 
4 that Gonzales was just trying to meet J.G. face to face so that he could try to win her back. ¶ 12 At the close of trial, the jury found Gonzales guilty of both counts. The court sentenced him to a term of five years imprisonment in the custody of the Department of Corrections on the burglary charge to be served concurrently with a two-year term on the trespass charge. II. Analysis ¶ 13 On appeal, Gonzales raises five issues: (1) the evidence was insufficient to support the burglary conviction; (2) the trial court erroneously admitted prior bad act evidence; (3) the trial court erroneously admitted an audio recording that was cumulative and unduly prejudicial; (4) the prosecutor committed misconduct in his opening statement and closing argument; and (5) the burglary and trespass convictions should have merged at sentencing ¶ 14 We agree with Gonzales on the first issue. Because the evidence was insufficient to prove Gonzales was guilty of burglary, we vacate that conviction and note that the constitutional guarantees against double jeopardy bar the prosecution from retrying him on that charge. See People v. Knobee, 2020 COA 7, 
5 ¶ 12 (cert. granted June 29, 2020). Because we conclude the erroneous admission of Gonzales’ prior bad acts was harmless, we affirm the trespassing conviction. A. Sufficiency of the Evidence ¶ 15 Gonzales first contends that his burglary conviction must be vacated because stalking — serious emotional distress, as pleaded and proved at his trial, could not serve as the predicate offense for burglary since it wasn’t a “crime against another person.” We agree. 1. Standard of Review ¶ 16 We review sufficiency of the evidence claims — including those raised for the first time on appeal and those that involve preliminary questions of statutory interpretation — de novo. McCoy v. People, 2019 CO 44, ¶ 27; Maestas v. People, 2019 CO 45, ¶ 2. ¶ 17 Likewise, we review statutory interpretation questions de novo. People v. Sprinkle, 2021 CO 60, ¶ 12. Our goal is to ascertain and give effect to the General Assembly’s intent. Id. at ¶ 22. We start by examining the plain language of the statute and, reading the statute as a whole, give its words and phrases their plain and ordinary meaning. Id. In the absence of a legislative definition, we 
6 interpret a statutory term in accordance with its ordinary or natural meaning. Cowen v. People, 2018 CO 96, ¶ 14. 2. Discussion ¶ 18 The question of whether stalking — serious emotional distress is a “crime against another person” requires us to interpret the burglary statute. ¶ 19 As relevant here, “[a] person commits second degree burglary, if the person knowingly breaks an entrance into, enters unlawfully in, or remains unlawfully after a lawful or unlawful entry in a building or occupied structure with intent to commit therein a crime against another person or property.” § 18-4-203(1), C.R.S. 2020. ¶ 20 The legislature has not defined the term “crime against another person,” but two divisions of our court have interpreted the provision in published decisions. See People v. Wright, 2021 COA 106, ¶¶ 14-27; People v. Poindexter, 2013 COA 93, ¶¶ 5-34. We agree with and adopt the reasoning of both divisions. ¶ 21 Because the legislature didn’t define the term “crime against another person,” both divisions looked to Black’s Law Dictionary for guidance. Wright, ¶ 17; Poindexter, ¶ 11; see Cowen, ¶ 14 (“When 
7 determining the plain and ordinary meaning of words, we may consider a definition in a recognized dictionary.”). Black’s contains two relevant definitions, both of which aid our analysis. The definitions concern “crimes” or “offenses” against persons
1
: • “[C]rimes against persons. A category of criminal offenses in which the perpetrator uses or threatens to use force. Examples include murder, rape, aggravated assault, and robbery.” Poindexter, ¶ 11 (quoting Black’s Law Dictionary 401 (8th ed. 2004)). • “[O]ffense against the person. A crime against the body of another human being. The common-law offenses against the person were murder, manslaughter, mayhem, rape, assault, battery, robbery, false imprisonment, abortion, seduction, kidnapping, and abduction.” Id. (quoting Black’s Law Dictionary at 1112). ¶ 22 Under these definitions, some offenses are always “crimes against another person” as a matter of law. See Wright, ¶ 26 1 The terms “crime” and “offense” are synonymous under Colorado law. § 18-1-104(1), C.R.S. 2020; People v. Poindexter, 2013 COA 93, ¶ 11. 
8 (“[B]ecause subjecting another to ‘physical contact’ is an essential element of harassment, there is no factual scenario that can constitute harassment that would not also constitute a “crime against a person.”).
2 Based on their elements, such offenses require proof under any scenario that the defendant used or threatened to use force or acted against the body of another person. ¶ 23 Other offenses, such as obstructing a peace officer, are not as clear cut. See Poindexter, ¶¶ 29, 31. These offenses require us to undertake a case-by-case examination of the underlying elements of the offense as charged and proved. Id. at ¶ 26. In doing so, we “consider the particular factual circumstances of each case and whether the evidence established that the offender intended to either act ‘against the body of another human being’ or ‘use[] or threaten[] to use force.’” Wright, ¶ 22 (quoting Poindexter, ¶¶ 11, 29). 2 Like the stalking statute, the harassment statute contains multiple subsections that set forth different ways a person can commit the offense. Subsection (1)(a) of section 18-9-111, C.R.S. 2020 — the provision at issue in People v. Wright, 2021 COA 106 — is the only subsection that requires proof of physical contact as an essential element of the offense. 
9 ¶ 24 The legislature has amended the second degree burglary statute since Poindexter was announced.
3 Ch. 376, sec. 1, § 18-4-204, 2018 Colo. Sess. Laws 2280. However, it has refrained from defining or clarifying the term “crime against another person or property.” This lack of action is notable, because it “is a persuasive indication that the General Assembly approves of the construction” of a statutory term. People v. McDonald, 2020 COA 65, ¶ 31, rev’d, 2021 CO 64; see also Rauschenberger v. Radetsky, 745 P.2d 640, 643 (Colo. 1987) (“When a statute is amended, the judicial construction previously placed upon the statute is deemed approved by the General Assembly to the extent that the provision remains unchanged.”), superseded by statute as stated in White v. Hansen, 837 P.2d 1229 (Colo. 1992); accord Tompkins v. DeLeon, 197 Colo. 569, 570-71, 595 P.2d 242, 243-44 (1979). ¶ 25 The stalking statute outlines three alternative methods by which the prosecution can allege a person committed the offense. § 18-3-602(1), C.R.S. 2020. Two of the methods, which are not 3 Wright was announced after the conclusion of the most recent legislative session. 
10 applicable here, require the prosecution to prove that the defendant made a credible threat to another person. § 18-3-602(1)(a), (b). The third method — at issue here — does not require proof of a credible threat. Under section 18-3-602(1)(c), [a] person commits stalking if directly, or indirectly through another person, the person knowingly . . . [r]epeatedly follows, approaches, contacts, places under surveillance, or makes any form of communication with another person . . . in a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person . . . to suffer serious emotional distress. ¶ 26 This subsection does not require proof that a person used or threatened force or committed an offense against the body, and there are myriad potential factual scenarios where a person could commit stalking — serious emotional distress without using or threatening force or acting against the body of another. Therefore, stalking — serious emotional distress is not a “crime against another person” as a matter of law. See Wright, ¶ 26. ¶ 27 In reaching this conclusion, we reject as overly broad the People’s arguments that the plain language and legislative declaration of the stalking statute necessarily means stalking — serious emotional distress is always a “crime against another 
11 person” and that the “modern” definition of “person” includes “personality” or “self,” which describes the “entire person” including “body, emotions, thoughts, and sensations.” ¶ 28 Under the People’s reasoning, virtually any crime that caused emotional harm or discomfort to the victim would qualify as a predicate offense to burglary. It’s no stretch to say that the vast majority of crimes cause at least some emotional harm to the victims. We decline to adopt such a broad interpretation because it is inconsistent with the legislature’s intent to place a limit on the type of predicate offenses which can be the object of a burglary. See Poindexter, ¶ 26. ¶ 29 Because stalking — serious emotional distress isn’t a “crime against another person” as a matter of law, we must examine whether, based on the facts and circumstances as pleaded and proved at trial, it met that definition here. See id. We conclude that it didn’t. ¶ 30 The prosecution presented no evidence that Gonzales intended to use or threatened to use force against J.G or that he intended to commit a crime against her body. In fact, J.G. explicitly testified that Gonzales never directly or indirectly threatened her and that he 
12 went out of his way to say that he wasn’t threatening her. Therefore, we cannot say that Gonzales intended to commit a “crime against another person.” ¶ 31 This isn’t to say that stalking — serious emotional distress can never meet that definition. Under different circumstances, it could be a “crime against another person.” See id. at ¶ 31. But, in this case, it wasn’t. Therefore, it could not serve as a predicate offense for Gonzales’ burglary conviction and the evidence was insufficient to support that conviction. B. Prior Bad Act Evidence ¶ 32 Next, Gonzales contends that the court erroneously admitted evidence that he’d been violent towards J.G. during their relationship. Again, we agree. 1. Standard of Review ¶ 33 We review the trial court’s evidentiary rulings for an abuse of discretion. People v. Moore, 2021 CO 26, ¶ 26. The trial court abuses its discretion if its ruling is manifestly arbitrary, unreasonable, or unfair, or where it is based on an erroneous view of the law. People v. Manzanares, 2020 COA 140M, ¶ 28. 
13 ¶ 34 We review preserved nonconstitutional errors for harmlessness. People v. Baker, 2021 CO 29, ¶ 38. We must reverse where an error “substantially influenced the verdict or affected the fairness of the trial proceedings.” Id. (quoting Hagos v. People, 2012 CO 63, ¶ 12). We will disregard an error as harmless only if the prosecution demonstrates that there is no reasonable probability that the error adversely affected the outcome of the trial. People v. Williams, 2020 CO 78, ¶ 24. 2. Additional Background ¶ 35 During cross-examination, defense counsel questioned J.G. about the content of the text messages and her reaction to the messages: Defense counsel: At no point does he ever threaten you directly? J.G.: Or indirectly, no sir. Defense counsel: And, in fact, he goes out of his way to basically say, I’m not threatening you? J.G: That’s exactly what he was doing, yes. Defense counsel: I don’t want to argue with you? J.G.: Uh-huh. 
14 Defense counsel: I don’t want to start a fight with you? J.G.: Right. Defense counsel: I just want to talk with you? J.G.: Right. Defense counsel: But you were done talking? J.G.: Yes, I was. Defense counsel: And, again, you know, for lack of a better term this was just getting really annoying? J.G.: Really annoying, yes. Defense counsel: Maybe even aggravating? J.G.: Yeah, I guess you could say aggravating. I mean, I wasn’t mad, but it was annoying, very annoying. Defense counsel: Enough is enough? J.G.: Correct. Defense counsel: But you weren’t scared of him? J.G.: Never have been. ¶ 36 At the conclusion of the cross-examination, the prosecution argued that J.G.’s answer that she’d never been afraid of Gonzales 
15 opened the door to the admission of evidence of prior violence in the relationship. The prosecutor conceded that he had not provided pretrial notice of his intent to introduce CRE 404(b) evidence. ¶ 37 The evidence consisted of a statement J.G. made during a follow-up interview with a detective a few days after Gonzales’ arrest where she described violence in the relationship. The detective’s report, which summarized the interview, was read into the record outside the presence of the jury before the court’s ruling. ¶ 38 Defense counsel objected. He argued that J.G.’s answer, which was not responsive to his narrowly tailored question, could not open the door to the evidence. Additionally, he argued that the danger of prejudice outweighed the probative value of the evidence and argued that, because of the lack of information regarding the context and timing of the prior violence, its admission created the “potential to explode [this trial] into something that . . . it isn’t intended to be.” ¶ 39 The court overruled the objection and found that it was “a classic inconsistent statement situation . . . that goes directly to the credibility of the witness.” The court ruled that the prosecution 
16 could impeach J.G. with her prior statement but prohibited the prosecution from going into the facts of the specific prior incidents. ¶ 40 After the court’s ruling, the prosecutor questioned J.G. about her prior statement at the end of re-direct: Prosecutor: Okay. Ma’am, one last question. You indicated on cross-examination that you’ve never been scared of Mr. Gonzales? J.G.: No, I have not. I’m not afraid of him, no. Prosecutor: Okay. Didn’t you tell Detective Barkley, though, specifically and he asked, you told him that there had been prior incidences of violence in your relationship? J.G.: There had been prior incidences of the escalating violence yes, but, I was still not afraid of him. He never left a mark on me, he’s never hurt me, physically. Tried but never physically hurt me. 3. Discussion ¶ 41 Gonzales contends that the evidence was inadmissible under CRE 404(b) and that the court misapplied the law regarding inconsistent statements and misconstrued the “opening the door” doctrine by admitting it. ¶ 42 The People argue that the evidence was admissible under multiple theories: as an inconsistent statement under CRE 613 and 
17 section 16-10-201, C.R.S. 2020; as a specific act of prior conduct related to J.G.’s character for truthfulness under CRE 608(b); and as prior bad act evidence under CRE 404(b). Additionally, they argue that even if the evidence was otherwise inadmissible, the defense opened the door to its admission. ¶ 43 We begin by evaluating whether the evidence was admissible. We conclude that it wasn’t. Then, we evaluate whether the cross-examination of J.G. opened the door to its admission. We conclude that it didn’t. a. CRE 613 and Section 16-10-201 ¶ 44 The evidence was not admissible as an inconsistent statement under CRE 613 or section 16-10-201 for two reasons. First, J.G.’s statements about Gonzales’ violent conduct — which made no mention of fear — were not actually inconsistent with her trial testimony. See, e.g., City of Gunnison v. McCabe Hereford Ranch, Inc., 702 P.2d 768, 770 (Colo. App. 1985) (trial court didn’t abuse its discretion in precluding impeachment with evidence that wasn’t inherently inconsistent with and was made in a different context than the witness’ trial testimony); 22 Stephen A. Hess & Sheila K. Hyatt, Colorado Practice Series: Handbook on Evidence ER 613 cmt. 
18 3(c) (2020-2021 ed.) (“In order to satisfy the foundational requirements of [CRE 613], it is necessary that the prior statement actually be inconsistent with the witness’ testimony.”). ¶ 45 Second, even assuming J.G.’s prior statement was actually inconsistent, it was precluded by other evidentiary rules. A witness’ prior inconsistent statements about other act evidence are still subject to the strictures of CRE 404(b) (governing substantive evidence) and CRE 608 (governing impeachment evidence). People v. Fortson, 2018 COA 46M, ¶ 39. The framework governing inconsistent statements “simply sets forth the procedure for proper impeachment of a witness with that witness’ prior inconsistent statements; it does not permit, much less address, the permissible uses of other act evidence.” Id. at ¶ 38. b. CRE 608(b) ¶ 46 “[E]vidence of specific acts used solely for impeachment is governed by [CRE] 608(b).” People v. Segovia, 196 P.3d 1126, 1130 (Colo. 2008). CRE 608(b) allows a party to ask a witness about specific acts of the witness’ conduct that are probative of the witness’ character for truthfulness or untruthfulness. Id. 
19 ¶ 47 The People contend that J.G.’s prior statement to the detective was admissible as impeachment evidence because it was probative of her character for untruthfulness. We disagree. ¶ 48 It’s clear that the evidence wasn’t introduced solely for impeachment purposes. Instead — as the prosecutor conceded when he cited CRE 404(b) in his offer of proof — it was introduced as substantive evidence. ¶ 49 The prosecutor’s question, which assumed that J.G.’s allegations of prior domestic violence against Gonzales were true, was not merely tailored to impeach J.G.’s credibility. See Fortson, ¶ 32. Instead, it highlighted specific instances of Gonzales’ prior misconduct and created the inference that J.G. was afraid of Gonzales because of his prior bad acts. See id. at ¶ 40. c. CRE 404(b) ¶ 50 The People, while acknowledging that the trial court didn’t make specific findings or explicitly conduct the analysis outlined in People v. Spoto, 795 P.2d 1314 (Colo. 1990), contend that the other bad act evidence was nonetheless admissible under CRE 404(b). The People argue that the court implicitly found good cause to 
20 excuse the lack of pretrial notice and implicitly found that the evidence was admissible under CRE 404(b). ¶ 51 We conclude that the evidence was inadmissible under the fourth Spoto factor because its probative value was substantially outweighed by the danger of unfair prejudice. CRE 403; Spoto, 795 P.2d at 1318. In reaching this conclusion, we don’t opine on whether the court erred by not making specific findings and we do not make specific findings on whether the evidence satisfied the first three prongs of Spoto. ¶ 52 When examining the fourth Spoto prong, we consider the extent to which the proffered other act evidence adds logical force, independent of the proscribed inference of bad character, to the existing body of evidence proving the same material fact. Williams, ¶ 14. We don’t consider the probative value of the evidence in isolation but instead consider the marginal or incremental probative value of the evidence relative to the probative force of other evidence available in the case. Id. Then we weigh that marginal probative value against the inherently prejudicial impact of allowing the jury to hear that the defendant has committed prior bad acts and is therefore known to be a person of negative character. Id. 
21 ¶ 53 Here, any marginal probative value of the evidence was low. The evidence did not contradict J.G.’s testimony that she wasn’t afraid of Gonzales, and it was not relevant to any of the elements the prosecution had to prove at trial. Additionally, the prosecution had already introduced J.G.’s prior statements to the police indicating that she was in fact afraid of Gonzales. The prior bad act evidence did not add logical force to the existing body of evidence. See id. ¶ 54 On the other hand, the evidence had a greater danger of unfair prejudice. Evidence of prior crimes or bad acts “has a distinct and unmistakable potential for unfair prejudice.” People v. Rath, 44 P.3d 1033, 1043 (Colo. 2002). The prior bad act evidence was arguably more serious than the charges Gonzales faced, and the prior bad act evidence was dissimilar to the charged conduct. See Perez v. People, 2015 CO 45, ¶ 27; People v. Brown, 2014 COA 130M, ¶¶ 11-12. ¶ 55 Overall, the evidence of “prior incidences of . . . escalating violence” created a danger that the jury would convict Gonzales as punishment for his past deeds, overvalue the evidence when assessing Gonzales’ guilt on the charged offenses, or require him to 
22 disprove or explain his prior acts. See Kaufman v. People, 202 P.3d 542, 552 (Colo. 2009) d. Opening the Door ¶ 56 Having concluded that the evidence was inadmissible, we turn to the question of whether the defense nonetheless opened the door to its admission. ¶ 57 Evidence that is otherwise inadmissible can become admissible if the defendant “opens the door” to it. People v. Cohen, 2019 COA 38, ¶ 21; see Golob v. People, 180 P.3d 1006, 1012 (Colo. 2008) (“When a party opens the door to otherwise inadmissible evidence, his opponent may then inquire into the previously barred matter.”). The concept prevents one party from gaining and maintaining an unfair advantage by selectively presenting facts that, without elaboration or context, create an incorrect or misleading impression for the jury. Golob, 180 P.3d at 1012. ¶ 58 We agree with Gonzales that the court misapplied the opening the door doctrine for two reasons. First, an unpredictable witness’ answer that is nonresponsive to a question, or that is responsive but broader than the question calls for, does not open the door to otherwise inadmissible evidence. 21 Kenneth W. Graham, Jr., 
23 Federal Practice and Procedure Evidence § 5039.1, Westlaw (2d ed. database updated Apr. 2021) (“[A] nonresponsive answer to a question by a party does not open the door either for the questioning party or an opponent.”); 1 Christopher B. Mueller & Liard C. Kirkpatrick, Federal Evidence § 1.12, Westlaw (4th ed. database updated May 2021) (“Unresponsive answers, or those that are responsive but broader than the question, are not the responsibility of the questioner.”). ¶ 59 Second, assuming a witness’ nonresponsive answer can open the door, J.G.’s answer did not do so. The concept of “opening the door” isn’t unlimited, and inadmissible rebuttal evidence is allowed only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence. Cohen, ¶ 23. Put another way, the doctrine does not “give an opponent unbridled license to introduce otherwise inadmissible evidence into the trial, nor does it justify receipt of rebuttal evidence merely because it is in the same category of excludable evidence as the evidence previously offered.” Id. (quoting United States v. Martinez, 988 F.2d 685, 702 (7th Cir. 1993)). 
24 ¶ 60 Here, the potential prejudice to the prosecution was that J.G.’s answer could mislead the jury to believe that she’d never been afraid of Gonzales, even though she’d made prior statements to the contrary. Therefore, to remove any unfair prejudice, the prosecution could introduce evidence of her prior fear, but only to the extent necessary to rebut any adverse inferences or to correct any incorrect or misleading statements. See id. at ¶ 26. ¶ 61 The evidence of prior violence exceeded those limits. Because the evidence did not contradict J.G.’s answer, its admission went “beyond the necessity of removing prejudice in the interest of fairness.” Id. at ¶ 23 (quoting Martinez, 988 F.2d at 702). Instead of preventing prejudice, the evidence injected prejudice into the case. Id. Additionally, J.G. had already testified on direct examination that she had submitted a victim impact statement where she wrote that she “fear[ed] for [her] safety.” Therefore, the court erred by allowing the evidence under the “opening the door” doctrine. e. The Error Was Harmless ¶ 62 Finally, a reviewing court can disregard an error as harmless if it can say with fair assurance, in light of the entire record, that the 
25 error didn’t substantially influence the verdict or impair the fairness of the trial. Hagos, ¶ 12. Thus, reversal is required only if there’s a reasonable probability the error contributed to the conviction. See Pernell v. People, 2018 CO 13, ¶ 22. The single most important factor in making this determination is whether the case was close. People v. Casias, 2012 COA 117, ¶ 69. We conclude that the error here was harmless to the remaining trespass charge. ¶ 63 The offending testimony in this case was fleeting. It was a single statement in the course of a day-long trial with several witnesses. J.G. didn’t specifically describe any violent incident or add any inflammatory details. See Callis v. People, 692 P.2d 1045, 1053 (Colo. 1984) (evidentiary error harmless where the evidence of prior criminality was not an express reference to a crime and did not delineate the nature of the past criminal conduct). Not only that, but she tempered the statement with testimony that she wasn’t afraid of Gonzales and he had never physically hurt her — testimony that was unhelpful to the prosecution’s case. Finally, the prosecution never referred to the violence testimony again. See, e.g., People v. Kern, 2020 COA 96, ¶ 16 (concluding “relatively brief and vague” references to a restraining order were harmless); People 
26 v. Herdman, 2012 COA 89, ¶¶ 46-47 (references to the defendant’s past cocaine use didn’t warrant reversal where the references “were few, fleeting, and not detailed”). ¶ 64 We cannot say that this was a close case on the trespass charge. To establish trespass, the prosecution had to prove that Gonzales knowingly and unlawfully entered or remained in J.G.’s dwelling. See § 18-4-502, C.R.S. 2020. J.G. testified that Gonzales wasn’t on the lease, he didn’t have a key, and that she told him not to come to the house the day of the trespass. She also identified one of Gonzales’s text messages in which he acknowledged that J.G. didn’t “want [him] there.” J.G. also testified she left town to avoid Gonzales and told her roommate not to answer the door if Gonzales came over. ¶ 65 The roommate testified that she was home alone when Gonzales showed up. She stated that she opened the door thinking he was someone else and Gonzales then elbowed his way into the home. She repeatedly asked him to leave and, after the third request, he left. ¶ 66 Finally, one of the responding officers testified that he spoke with J.G. as part of his investigation. She confirmed that Gonzales 
27 didn’t live at the home and he “did not have permission to be at that address.” Thus, in our view, the case was not close and the properly admitted evidence “overwhelmingly demonstrates” Gonzales trespassed, rendering any error from the prior violence testimony harmless. See, e.g., People v. Summitt, 132 P.3d 320, 327 (Colo. 2006) (a trial court’s evidentiary error is harmless if properly admitted evidence overwhelmingly shows guilt). ¶ 67 To be sure, J.G. testified that at other times and occasions Gonzales had permission to enter the home. But previous permission to enter the home doesn’t confer a perpetual, unlimited right to entry. See People v. Hanna, 981 P.2d 627, 629 (Colo. App. 1998) (rejecting the defendant’s argument that insufficient evidence supported her trespass conviction, in part because “she had been allowed access to the house in the past”). So even if Gonzales enjoyed permission to enter the home on other occasions, he undisputedly had no permission to enter the home the day he trespassed. ¶ 68 Perhaps recognizing the strength of this evidence, Gonzales doesn’t argue the evidentiary error impacted the trespass conviction. He instead argues that the evidence “unfairly bolstered 
28 the prosecution’s claim that [Gonzales] meant to stalk” the victim and that “the evidence on that element was keenly disputed at trial.” Maybe so, but such harm goes to the burglary conviction (and more particularly the predicate stalking offense). Gonzales doesn’t say — and we don’t see — how the prior violence testimony impacts the unchallenged testimony that Gonzales entered the home without permission and didn’t leave when first asked. ¶ 69 For these reasons, we don’t believe that the “prior violence” testimony substantially influenced the trespass conviction or impaired the fairness of the trial. III. Remaining Contentions ¶ 70 Gonzales’s remaining contentions are that the trial court erroneously admitted an audio recording that was cumulative and unduly prejudicial, that the prosecutor committed misconduct in his opening statement and closing argument, and that the burglary and trespass convictions should have merged at sentencing. We need not reach most of these issues. Our ruling vacating the burglary conviction renders the merger issue and any issues with the prosecutor’s closing statement moot. Gonzales does not argue 
29 that the audio recording had any impact outside the burglary, similarly rendering that issue moot. ¶ 71 In his remaining issue Gonzales contends that the prosecutor committed misconduct in his opening statement when he said that he was “legally required” to call J.G. as a witness. There was no contemporaneous objection to this statement. We review unpreserved allegations of prosecutorial misconduct for plain error. Wend v. People, 235 P.3d 1089, 1097 (Colo. 2010). Plain error occurs only if the statement “so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the jury’s verdict.” Dominguez-Gomez v. People, 125 P.3d 1043, 1053 (Colo. 2005). Reversal is required only for “prosecutorial misconduct which is ‘flagrantly, glaringly, or tremendously’ improper.” Id. (quoting People v. Avila, 944 P.2d 673, 676 (Colo. App. 1997)). ¶ 72 We cannot conclude on this record that the prosecutor’s single comment in his opening statement rises to this level. In context, the prosecutor’s statement explains why J.G. was a reluctant witness and why he compelled her attendance. These assertions were later introduced through J.G.’s own testimony. Even if we 
30 assume the prosecutor’s statement was error, we would not find that this single statement was so “flagrantly, glaringly, or tremendously improper” as to cast serious doubt on the reliability of the jury’s verdict here. See People v. Denhartog, 2019 COA 23, ¶ 66 (“The prosecutor’s single misstatement does not cause us to question the reliability of the judgment of conviction and we therefore discern no plain error.”). IV. Conclusion ¶ 73 We affirm Gonzales’ judgment of conviction for trespass. We vacate the judgment of conviction for second degree burglary and remand to the trial court for correction of the mittimus and resentencing. JUDGE DAILEY and JUDGE DUNN concur.